IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

RONTONIO AUGUSTUS,

        Defendant.

No. 3:16-cr-00072-HZ

OPINION & ORDER

Leah K. Bolstad
U.S. Attorney's Office, District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

    Attorney for Plaintiff

Thomas Eugene Price
Federal Public Defender's Office
101 SW Main Street, Suite 1700
Portland, OR 97204

    Attorney for Defendant

1 – OPINION & ORDER

HERNÁNDEZ, District Judge:

Defendant Rontonio Augustus moves to suppress all physical evidence, including a firearm, seized on February 7, 2016, and any statements he made to law enforcement following his detention and arrest. Because police officers had reasonable suspicion to detain and frisk Defendant, which led to the seizure of the firearm and Defendant's subsequent statements, the Court denies Defendant's motion.

## BACKGROUND[1]

On February 7, 2016, at approximately 9:00 p.m., Portland Police Bureau ("PPB") officers responded to a call reporting a large fight at the Shamrock Bar at 4919 SE 82nd Avenue in Portland, Oregon. Govt. Ex. 3 ("Fight Call Record"), ECF 47-1. A 9-1-1 caller reported approximately 40 people fighting, including a 24 year-old black male with an "afro" who had a gun tucked in his waistband. Id. When officers arrived at the bar, most of the people involved in the fight had dispersed and the suspect with the gun was gone. Id.

PPB Gang Enforcement Team ("GET") Officers Fender and Polas were working in a partner car on February 7, 2016, and heard the report of the Shamrock Bar disturbance. Def. Ex. 204 ("Polas Report") at 2. While they did not respond to the call, they decided that they would do a walk-through of the bar later in the evening. Id. Officers Fender and Polas testified that it is common for GET members to revisit locations that have had a disturbance or gang presence in order to prevent further violence and to build community trust in law enforcement.

---

[1] The Court heard testimony and received evidence related to Defendant's motion at a hearing on July 29, 2016. In addition, the Court allowed the parties to submit supplemental post-hearing memoranda. What follows is a summary of the Court's factual findings based on its evaluation of the credibility of the witnesses' testimony and the probative value of the evidence submitted.

Shortly after midnight, Officers Fender and Polas went to the Shamrock Bar. Def. Ex. 205 ("Fender Report") at 2. As they drove through the parking lot, they saw a number of patrons through the windows of the bar. Id. Through one window, they saw Defendant, a black man with braids and a black and gray jacket, who they perceived to be extremely nervous. Id.; Polas Report 2. According to the officers, Defendant moved quickly away from the window as soon as he saw the officers in the parking lot. Id. Based on the surveillance video obtained from the bar and Defendant's cell phone records, it appears that Defendant was talking on his cell phone and pacing around the bar at the time that Officers Fender and Polas observed him. Govt. Ex. 6 ("Surveillance Video"), Def. Ex. 213.

Instead of entering the bar, Officers Fender and Polas pursued a car that they saw exiting the Shamrock Bar parking lot. Polas Report 2; Fender Report 2. They conducted a traffic stop a few blocks away. Id. In the meantime, GET Sergeants Dulio and Jones, and GET Officers Defrain and Ortiz arrived at the Shamrock Bar at approximately 12:25 a.m. to conduct a check of the premises.

At 12:25:00[2] a.m., Officers Defrain and Ortiz entered the bar and at 12:25:28 a.m., Sergeant Dulio and Sergeant Jones entered the bar. Surveillance Video. Sergeant Dulio testified that when he entered the bar, he walked into the video poker area, a separate room in the bar where several patrons, including Defendant, were sitting, standing, and playing poker. Sergeant Dulio chatted with the patrons in the room and explained that the police were checking on the bar because of the fight that had occurred earlier. Sergeant Dulio noticed that Defendant avoided eye contact, turned away, and tried to distance himself from the Sergeant. According to Sergeant Dulio, this behavior was different than that of the other patrons, who answered questions and

---

[2] The time stamp on the surveillance video indicates that the officers entered at 1:25 a.m. However, the parties do not dispute that the time stamp is inaccurate by one hour. The passage of time captured on the time stamp is accurate.

3 – OPINION & ORDER

engaged with the Sergeant. Sergeant Dulio communicated his observations to Sergeant Jones and Officer Defrain and decided to observe Defendant until additional officers arrived at the bar. One to two minutes later, Officers Fender and Polas entered the bar. Surveillance Video. After briefly surveying the main area of the bar, they walked towards the video poker room. Id.

Officer Fender testified that Sergeant Jones told him that Sergeant Dulio was keeping an eye on a suspicious individual with long braids in the video poker area. According to Officer Fender, as soon as he saw the person Sergeant Dulio was watching, Officer Fender recognized the person as Defendant, the same man he had seen previously through the bar window.

By the time Officer Fender arrived in the video poker room, Defendant was seated at the video poker machine closest to the doorway. Surveillance Video. At 12:27:43, Officer Fender began speaking to Defendant. Id. Six seconds later, at 12:27:49, Officer Defrain entered the video poker room and positioned himself behind Defendant. Id. Sergeant Dulio stood to the right of Defendant.

Officer Fender testified that, as he stood in the doorway of the video poker room watching Defendant, he could see Defendant's eyes darting all around. Officer Fender claims that he could see Defendant's hands visibly shaking. Officer Fender initiated a conversation with Defendant, asking him how he was doing and explaining that the police were making sure everything was peaceful inside the bar. Officer Fender told Defendant that he was not in trouble and that he was not under arrest.

Officer Fender testified that, as he was talking to Defendant, he observed nervous mannerisms. According to Officer Fender, Defendant was moving his right arm up and down, as if to cover Officer Fender's view of Defendant's right leg. Officer Fender testified that when Defendant moved his right arm up to touch the button on the video poker machine, Officer

Fender could see a distinct bulge in the shape of a barrel of a handgun protruding from Defendant's pocket.

Officer Fender had been talking to Defendant for thirteen seconds when Officer Polas entered the video poker room and stood to the right of Defendant. Officer Polas testified that he immediately recognized Defendant as the same man he had seen behaving suspiciously through the window when the officers drove through the parking lot. Because of that previous behavior, Officer Polas decided to focus his attention on Defendant.

Officer Polas testified that he observed Defendant breathing heavily and Defendant's hand visibly shaking. Furthermore, Officer Polas testified that every time Defendant used his right arm to push a button on the video poker machine, Officer Polas could see a visible bulge in Defendant's pocket. As Defendant would lower his right arm, he would rest part of his forearm on his pant leg. Officer Polas believed that Defendant was "indexing," trying to conceal the bulge with his forearm. Officer Polas testified that he was "just about a hundred percent convinced" that Defendant had a gun in his pocket.

Officer Fender asked Defendant for his identification. Officer Fender testified that, at the same time, Officer Polas stepped closer to Defendant. According to Officer Fender, he did not order or command Defendant to produce the identification. Defendant reached into his back right pocket, removed his identification from his wallet, and handed it to Officer Fender.

Officer Polas asked Defendant if he had any weapons on him. Officer Polas testified that Defendant attempted to avoid the question by asking Officer Polas a question. Then, Officer Polas asked Defendant directly if he had a gun. Defendant ignored the question, which made Officer Polas even more suspicious. At that point, Officer Polas signaled to Officer Defrain to hold his left arm while Officer Polas held his right arm to pat him down and search for weapons.

At 12:29:12, Officers Polas and Defrain grabbed Defendant's arms. Officer Polas patted Defendant's right pant pocket and felt a firearm. At 12:29:22, Officer Polas signaled for Defendant's arrest. Officer Polas and Officer Defrain handcuffed Defendant. At the same time, Officer Fender ripped Defendant's hat off and yanked his head by grabbing his braids.[3]

The officers walked Defendant out of the bar and, once outside the bar, removed the gun from his pocket. After Defendant was outside and in handcuffs, Officer Fender advised him of his Miranda rights. Fender Report 3. Defendant stated, "man, I know I'm not supposed to have a gun, but I swear it ain't mine." Id. Officer Fender asked Defendant where the gun came from and Defendant told him that he had found it in the bathroom and had forgotten it was in his pocket until the police arrived and began talking to him. Id. Officer Fender asked Defendant if he had a concealed weapons permit and Defendant told him that he did not. Id. Then Officer Fender asked Defendant if he was a convicted felon and Defendant explained that he had just recently been released from prison after serving 15 years for attempted murder. Id.

On February 17, 2016, a federal grand jury indicted Defendant on one charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

## STANDARDS

The Fourth Amendment protects against unreasonable searches and seizures by the government. U.S. Const. Amend. IV; Elkins v. United States, 364 U.S. 206, 213 (1960) (applying Fourth Amendment protections to states and state actors through Fourteenth Amendment). A person is seized if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." United States v. Washington,

---

[3] Notwithstanding the surveillance video that clearly shows Officer Fender grabbing and yanking Defendant's hair, at the hearing Officer Fender repeatedly insisted that he did not pull Defendant's hair and that he only applied pressure to the back of Defendant's neck and head.

387 F.3d 1060, 1068 (9th Cir. 2004) ("Washington I") (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991) (internal quotation marks omitted)); see also United States v. Mendenhall, 446 U.S. 544, 554 (1980) (holding that an encounter is a seizure if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave").

## DISCUSSION

Defendant argues that the firearm seized on February 7, 2016, as well as any statements he made to law enforcement officers after his detention and arrest on that date, must be suppressed because the officers violated his Fourth Amendment rights by detaining and frisking him without reasonable suspicion. The Court finds that the officers had reasonable suspicion to stop and frisk Defendant.

Defendant and the Government agree that, at some point in the encounter between Defendant and the PPB officers, Defendant was seized and would not have felt free to leave. This case hinges upon determining at what point that seizure occurred. Defendant argues that he was seized at the moment that Officer Polas entered the video poker room, thereby becoming the fourth officer in the room, at 12:28:03 in the surveillance video. The Court disagrees. Instead, the Court opines that Defendant was seized at the moment that he handed his identification to Officer Fender. Because the officers had reasonable suspicion at that point to detain Defendant and investigate suspected possession of a gun, no Fourth Amendment violation occurred.

**I.      Officer Fender's conversation with Defendant did not constitute a seizure.**

The initial questioning of Defendant by Officer Fender poses no Fourth Amendment problems if Defendant consented to the encounter. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual . . . in [a] public place, by asking

him if he is willing to answer some questions [or] by putting questions to him if the person is willing to listen[.]" Florida v. Royer, 460 U.S. 491, 497 (1983). In assessing the voluntariness of police-citizen encounters such as the one here, the essential inquiry is whether "a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554; United States v. Erwin, 803 F.2d 1505, 1507 (9th Cir. 1986).

When Officer Fender began engaging Defendant in a conversation, the encounter was consensual, such that a reasonable person would have felt free to leave. In fact, people did move freely in and out of the video poker room even though there was a police presence there. As seen on the surveillance video, Officer Fender began talking with Defendant at 12:27:43 a.m. Six seconds later, a bar patron entered the room, passing Officer Fender and Sergeant Dulio. The patron looked around and walked out, passing the officer and sergeant on the way out. After Officer Polas entered the room, two other bar patrons entered the room, walking right past Officer Fender in the doorway. One patron stood behind Defendant, in between Sergeant Dulio and Officer Defrain, without any interference from the police officers. The scene in the video poker room from 12:27:43 until 12:28:41, when Defendant hands his identification to Officer Fender, is one of an officer engaged in a casual, consensual conversation with Defendant.

Furthermore, Officer Fender testified that when he approached Defendant, he told Defendant that the officers were there to check out the bar because of the incident earlier in the evening, but that Defendant was not under arrest or a target of their investigation. According to the testimony of Sergeant Dulio and Officers Fender and Polas, Officer Fender did not yell at Defendant, he did not give any orders, and no officer had a weapon drawn or placed any hands on Defendant or any other bar patron.

The Court concludes that Officer Fender's initial encounter with Defendant was not a seizure and did not implicate the Fourth Amendment. The encounter took place in a public space. While Officer Fender stood in the doorway to the video poker room, he did not block the exit, as evidenced by the other patrons who moved freely throughout the encounter. See United States v. $25,000 U.S. Currency, 853 F.2d 1501, 1504 (9th Cir. 1988) (finding the defendant's argument that he was surrounded by officers and blocked by a pillar unavailing because he could have easily walked around the officers and neither the officers or pillar prevented the defendant from leaving the area); Erwin, 803 F.2d at 1507 (no seizure when the defendant was questioned in a public place, officers did not use force, and officers told the defendant he was not under arrest). Officer Fender did not raise his voice, touch his weapon, make any threats, or communicate to Defendant that he was not free to leave. To the contrary, Officer Fender told Defendant that he was not the target of the officers' investigation and that he was not under arrest. While there were two to three other officers near Defendant while Officer Fender engaged him in conversation, those officers similarly did not block or threaten Defendant, nor did they touch their weapons or raise their voice.

## II. Defendant was seized at the moment he provided his identification to Officer Fender.

While Defendant was not seized during his initial encounter with Officer Fender, the encounter escalated into a seizure at the moment Defendant provided his identification in response to Officer Fender's request. A consensual encounter may become a seizure, as it evolves "into a situation where the individual's ability to leave dissipates." United States v. Ayarza, 874 F.2d 647, 650 (9th Cir. 1989). The Ninth Circuit has identified several factors to consider in determining if a person was seized, any one of which, if present, could constitute a seizure:

> (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter.

United States v. Washington, 490 F.3d 765, 771–72 (9th Cir. 2007) ("Washington II").

Applying these factors, the Court concludes that, under the totality of the circumstances, the officers' encounter with Defendant escalated into a seizure. At 12:28:21, Officer Polas took a step closer to Defendant, such that he blocked Defendant's ability to exit his chair on the right side. Twenty seconds later, at 12:28:49, Defendant handed his identification to Officer Fender. Officer Fender did not return the identification and Officer Polas remained standing close to Defendant. At the same time, Officer Polas began to ask Defendant questions such as "why are you so nervous" and "do you have a gun?"

This Court recognizes that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." United States v. Osborn, 203 F.3d 1176, 1180 (9th Cir. 2000) (quoting INS v. Delgado, 466 U.S. 210, 104 (1984)). For example, in United States v. Martinez, 182 F.3d 929 (9th Cir. 1999), no seizure occurred even though the officer retained the defendant's driver's license throughout the brief encounter because they were in a public place, the officer was alone, the officer did not touch or draw his weapon, the officer did not threaten the defendant, and the officer told the defendant he was free to leave.

However, while not dispositive, Officer Fender's retention of Defendant's identification weighs heavily in this Court's determination that Defendant was seized. The Ninth Circuit and other courts have indicated that this factor is important to the totality of circumstances analysis. For example, in United States v. Chan–Jimenez, a tribal police officer followed a pickup truck, then pulled over and activated his emergency lights after the truck stopped and the driver raised

10 – OPINION & ORDER

the hood, ostensibly indicating a mechanical problem. The officer did not return the driver's license and registration after confirming that they were "in order," but instead asked to search the truck. The Court held a seizure occurred when the officer did not return the license and registration after finding that they were in order, stating that:

> When a law enforcement official retains control of a person's identification papers, such as vehicle registration documents or a driver's license, longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the needed papers, a reasonable person would not feel free to depart.

United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir. 1997).

Here, not only did Officer Fender retain Defendant's identification, but the retention occurred simultaneously with the escalation of the interrogation through the involvement of Officer Polas. Neither officer told Defendant he was free to leave. Instead, Officer Polas began asking Defendant questions about why he was so nervous and whether he had a gun. Officer Polas was standing close to Defendant and blocking the main path to the exit. At that moment, Defendant would not have felt free to leave and, accordingly, he was seized.

### III.    The officers had reasonable suspicion to seize Defendant.

Having concluded that Defendant was seized, the Court must determine if that seizure violated the Fourth Amendment. A seizure of a person is justified under the Fourth Amendment if law enforcement officers have reasonable suspicion that a person committed, or is about to commit, a crime. Washington II, 490 F.3d at 774 (citing Royer, 460 U.S. at 498)). Without reasonable suspicion, a person "may not be detained even momentarily." Id.

Reasonable suspicion is less than probable cause; "[i]t is merely 'a particularized and objective basis' for suspecting the person stopped of criminal activity." United States v. Tiong, 224 F.3d 1136, 1140 (9th Cir. 2000) (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996)); see also Terry v. Ohio, 392 U.S. 1, 27 (1968) (explaining that, in determining whether

11 – OPINION & ORDER

an officer had reasonable suspicion, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience").

By the time Defendant provided his identification to Officer Fender, the officers had reasonable suspicion that Defendant was carrying a concealed firearm and, thus, was committing a crime. See Oregon Revised Statute § (O.R.S.) 166.250(1)(a) (person commits the crime of unlawful possession of a firearm if the person knowingly carries any firearm concealed upon the person). Both officers testified that they observed a visible bulge in Defendant's right front pants pocket in a shape consistent with the shape of a barrel of a handgun. Officer Polas testified that when Defendant pushed buttons on the video poker machine, he would raise his arm and reveal a bulge in his pants pocket. The video shows Officer Polas tilting his head and moving to get a better view of Defendant's pocket. According to Officer Polas, he was almost a hundred percent certain that the bulge was due to the presence of a firearm. Officer Fender testified that there were a few times that he had a clear view of the right front pocket of Defendant's pants and, in those times, he could see a distinct bulge in the shape of a handgun barrel.

The officers provided additional testimony to support their reasonable suspicion. Officer Fender stated that Defendant exhibited nervous mannerisms, such as darting eyes and shaking hands. Officer Polas testified that he observed that Defendant was breathing heavily and that Defendant's hand was visibly shaking as he was tried to press buttons on the video poker machine. Officer Defrain testified that Defendant appeared stiff, as if he was hiding something.

Other portions of the officers' testimony are less compelling to the Court. Both Officers Fender and Polas testified regarding Defendant's alleged "indexing" behavior. Officer Fender explained in his report that individuals who are carrying concealed firearms "feel the need to

12 – OPINION & ORDER

constantly hold and/or cover the area where the firearm is concealed in order to make sure it is still there. This motion is referred to as 'indexing.'" Fender Report 3. Officer Polas wrote that Defendant "was indexing his right pants pocket with his right arm, and appeared to be trying to conceal the bulge with his arm." Polas Report 3. However, the Court reviewed the surveillance video many times and does not see any evidence of "indexing." To the contrary, Defendant appears to keep his right arm raised above his leg, touching the video poker machine for the majority of the encounter. The only time he lowers his arm is to retrieve his identification, as requested.

The Court is also not persuaded by the officers' testimony that their suspicion of Defendant was heightened because they identified him as the same man they had seen through the bar window when they conducted their initial drive-through. Officers Polas and Fender testified that, when they first drove through the Shamrock Bar parking lot, they observed Defendant standing by the window looking out and looking extremely nervous. Supposedly, Defendant did not want to make eye contact and was pacing inside of the bar. The officers did not stop their car or enter the bar at that point.

Defendant has offered cell phone records to demonstrate that it is highly likely that when Officers Fender and Polas saw him, he was talking on the phone. Def. Ex. 213. In addition, the surveillance video shows Defendant pacing and wandering aimlessly, as people often do when engrossed in a phone conversation. The Court does not accept that the officers, in their brief glimpse up at the bar window, observed Defendant acting nervously or suspiciously, such that it would add to reasonable suspicion that he was involved in criminal activity when they encountered him later. The fact that Defendant was looking out the window and pacing is not inconsistent with other law-abiding conduct and it "describe[s] too many individuals to create a

reasonable suspicion that this particular defendant is engaged in criminal activity." United States v. Hernandez–Alvarado, 891 F.2d 1414, 1418–19 (9th Cir. 1989); see also United States v. Manzo–Jurado, 457 F.3d 928, 935 (9th Cir. 2006) ("Seemingly innocuous behavior does not justify an investigatory stop unless it is combined with other circumstances that tend cumulatively to indicate criminal activity.").

Nevertheless, the officers' observation of Defendant's nervous breathing, shaky hands, and, most importantly, the visible bulge in his pocket in the shape of a barrel of a gun, are sufficient to establish reasonable suspicion by the time Officer Fender took Defendant's identification. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); Thomas v. Dillard, 818 F.3d 864, 877 (9th Cir. 2016), as amended (May 5, 2016) (observing a visible bulge in a person's clothing that could indicate the presence of a weapon is relevant to assessing the totality of the circumstances); United States v. Flatter, 456 F.3d 1154, 1157 (9th Cir. 2006) ("[W]e have given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon."). Accordingly, the subsequent frisk of Defendant's pants pocket was permissible. See Terry, 392 U.S. at 30.

Defendant does not dispute that, once Officer Polas felt the firearm in Defendant's pocket, probable cause existed to arrest Defendant. United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)) ("Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested.").

## CONCLUSION

Defendant's motion to suppress [40] is denied.

IT IS SO ORDERED.

Dated this \_\_\_24\_\_\_ day of October, 2016.

_____
MARCO A. HERNÁNDEZ
United States District Judge